UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

BLAKE STEWARDSON,

    Plaintiff,

v.                                          CAUSE NO. 3:18-CV-958 DRL

CASS COUNTY *et al.*,

    Defendants.

## OPINION AND ORDER

On March 31, 2023, a jury found that Christopher Titus violated Blake Stewardson's Fourth Amendment rights by using excessive force and committing battery, with the Sheriff of Cass County held then liable for the battery. The jury awarded $400,000 in compensatory damages against both. The jury also awarded $850,000 in punitive damages against Mr. Titus. Mr. Titus and the Sheriff now ask the court to remit the compensatory damage award and vacate the punitive damage award or alternatively grant a new trial under Rule 59. The court denies the motion.

## BACKGROUND

Mr. Stewardson sued the Sheriff of Cass County, former officer Christopher Titus, and Officer Cameron Biggs for excessive force, battery, and failure to intervene, after a January 1, 2018 incident when officers arrested and detained Mr. Stewardson for driving while intoxicated. Over three days, Mr. Stewardson and the defendants presented evidence to a jury. The jury found Mr. Titus and the Sheriff liable and exonerated Officer Biggs.

During the trial, the jury heard and saw evidence about the interaction between Mr. Titus and Mr. Stewardson, including video footage of Mr. Titus slamming Mr. Stewardson into a concrete wall [Ex. 101 11:48:15-21] and executing a leg sweep to get him to the floor after Mr. Stewardson was stripped naked [Ex. 101 12:19:13-18]. Mr. Stewardson presented evidence of the long-lasting impacts the episode had on

his already extensive struggles with mental health, including testimony of family and friends who described the changes in him [Tr. 35]. He asked the jury to award over $2 million in damages [Tr. 562:17-18]. Instead, the jury awarded $400,000 in compensatory damages and $850,000 in punitive damages. The result is not surprising given the conduct plainly demonstrated on video.

## STANDARD

Rule 59 permits a party to move for a new trial or alter or amend the judgment. Fed. R. Civ. P. 59. The court may "grant a new trial on some or all of the issues." Fed. R. Civ. P. 59(a). "A new trial is appropriate if the jury's verdict is against the manifest weight of the evidence or if the trial was in some way unfair to the moving party." *Venson v. Altamirano*, 749 F.3d 641, 656 (7th Cir. 2014). It is an "extraordinary remed[y] reserved for the exceptional case." *Childress v. Walker*, 787 F.3d 433, 442 (7th Cir. 2015) (citations omitted).

Rule 59 allows for a new trial only if "the verdict is against the weight of the evidence, the damages are excessive, or if for other reasons the trial was not fair to the moving party." *Pickett v. Sheridan Health Care Ctr.*, 610 F.3d 434, 440 (7th Cir. 2010) (quoting *Emmel v. Coca-Cola Bottling Co.*, 95 F.3d 627, 636 (7th Cir. 1996)). Courts "uphold a jury verdict…as long as a reasonable basis exists in the record to support [the] verdict." *Id.* When considering a motion for a new trial, "the evidence must be viewed in the light most favorable to the prevailing party." *Carter v. Moore*, 165 F.3d 1071, 1079 (7th Cir. 1998).

Under Rule 59(e), a court may also "alter or amend a judgment." Fed. R. Civ. P. 59(e). This includes remittitur. *Baier v. Rohr-Mont Motors, Inc.*, 175 F. Supp.3d 1000, 1007 (N.D. Ill. 2016); *see also Sommerfield v. Knasiak*, 967 F.3d 617, 622 (7th Cir. 2020). On review, a court must give a jury's damage determination "substantial deference" but "must also ensure that the award is supported by competent evidence." *Ramsey v. Am. Air Filter Co.*, 772 F.2d 1303, 1313 (7th Cir. 1985). If an award is excessive, "it is the duty of the trial judge to require a remittitur or a new trial." *Linn v. United Plant Guard Workers*, 383 U.S. 53, 65-66 (1966); *see also Baier*, 175 F. Supp.3d at 1007 ("If the [c]ourt finds that damages are excessive,

the proper remedy is remittitur."). Remittitur is appropriate for damage awards that are "monstrously excessive," bear no rational connection to the evidence, and are not "roughly comparable to awards made in similar cases." *Gracia v. Sigmatron Int'l, Inc.*, 842 F.3d 1010, 1022 (7th Cir. 2016).

Movants must show that "no rational jury could have rendered a verdict against them." *King v. Harrington*, 447 F.3d 531, 534 (7th Cir. 2006). Courts use the same analysis for Rule 59 motions as summary judgment, except they "now know exactly what evidence the jury considered in reaching it verdict." *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004). The court must consider the evidence in the light most favorable to the prevailing party at trial, leaving issues of credibility and weight of evidence to the jury. *Carter*, 165 F.3d at 1079.

## DISCUSSION

A. *Compensatory Damages.*

The defendants ask the court to reduce the $400,000 compensatory damage award to $100,000 or offer Mr. Stewardson a new trial on damages. They bear the burden of showing that this jury behaved irrationally in reaching this amount, *see King*, 447 F.3d at 534, already substantially less than the $2 million in compensatory damages that Mr. Stewardson requested [Tr. 562:16-18]. Initially, the court observes that the jury only awarded 20 percent of Mr. Stewardson's proposed number, which alone suggests deliberation and analysis; as does the questions posed by the jury during deliberations.

Three factors bear on whether a compensatory award exceeds rational limits: "whether the damages awarded (1) were monstrously excessive; (2) had no rational connection between the award and the evidence; and (3) were roughly comparable to awards made in similar cases." *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 833 (7th Cir. 2013). "A monstrously excessive verdict is one that is a product of passion and prejudice" and is essentially the same inquiry as factor two: was this verdict irrational? *Adams v. City of Chi.*, 798 F.3d 539, 543 (7th Cir. 2015); *accord Green v. Howser*, 942 F.3d 772, 780-81 (7th Cir. 2019).

3

Courts have affirmed substantial compensatory damage awards in "cases that include even the slightest physical element." *EEOC*, 707 F.3d at 834 (listing large awards). The inquiry is not whether the jury could have possibly reached a lesser award, but instead whether the amount bears a rational connection to the evidence at trial. *Adams*, 798 F.3d at 543; *see also Hendrickson v. Cooper*, 589 F.3d 887, 893 (7th Cir. 2009) ("A different jury may have chosen a lower number, but this uncertainty is unavoidable when making different estimates of pain and suffering."). Comparisons to other cases matter, but "such comparisons are rarely dispositive given the fact-specific nature of damages claims." *Hendrickson*, 589 F.3d at 892.

The defendants advance three arguments for reducing compensatory damages. None convinces the court that remittitur is appropriate. Their first and second points basically suggest that Mr. Stewardson did not suffer enough for a $400,000 award. First, they argue that the evidence at trial demonstrated very minor physical injuries. The way the defendants spin the story, Mr. Stewardson had only a small cut and a brief period of difficulty breathing. They note that Mr. Stewardson didn't seek medical attention or miss work the next day. Second, they argue that the evidence did not support a finding that Mr. Stewardson's emotional and mental condition worsened after the excessive force. The jury believed the evidence supported $400,000 in damages, and this court sees no reason to doubt the jury. *See G.G. v. Grindle*, 665 F.3d 795, 799 (7th Cir. 2011) ("Great deference must be given to the jury's verdict, because…the jury [is] in a superior position to find facts and determine a proper damages award.") (quotations omitted).

This jury was in an especially privileged position to judge the damage done—they saw the whole incident unfold on tape—and anyone watching it could reasonably conclude that the force was excessive, even at different times, and worthy of compensation. Mr. Stewardson told the jury he remembered "fear" and "pain" from that night [Tr. 238:18-22]. He said that his face hit a cinderblock wall [Tr. 242:25-243:2]. Then the jury watched [Ex. 101 11:48:15-21]. He described feeling like he was "being crushed and held" [Tr. 252:21-23], and the jury saw officers hold him in a folded position for 26 minutes [Ex. 101 11:49-

4

12:15:04]. Between hearing about Mr. Stewardson's efforts to "try and get the blood out of [his] face and breathe" [Tr. 256:5-6], and his back, shoulder, head, and kidney pain and the shame and humiliation he felt [Tr. 265:17-19], the jury had plenty of evidence of harm to rely on beyond a simple cut to the forehead—a cut the jury witnessed create a pool of blood on the padded cell floor twice [Ex. 101 1:01:30; 1:21]. Mr. Stewardson described how "everything hurt" [Tr. 275:12]. *See Hendrickson,* 589 F.3d at 893 ("Given the uniquely subjective nature of pain," it is understandable for plaintiffs to rely on their own testimony for damages evidence.).

In addition, the jury heard testimony on his long-lasting emotional damage. The defense acknowledges that mental health expert testimony is not required for mental or emotional damage. But they ask the court to weigh its absence anyway, something the jury would have done. *See United States v. Longstreet*, 567 F.3d 911, 919 (7th Cir. 2009). Mr. Stewardson's wife testified about his nervousness, his avoidance of family occasions, and how easily frightened he became [Tr. 85-86, 88, 91:15-24]. Jessica Ulrey, Mr. Stewardson's mother, described the changes in her son after the incident, including how he missed family events like his sister's graduation and became uncharacteristically withdrawn and uncommunicative [Tr. 53-55]. Other friends of Mr. Stewardson's also testified that he was withdrawn after the incident [Tr. 36 (Sarah Silence); Tr. 30 (Charles Hedges)]. The jury could have rationally concluded that this evidence supported a sizeable damages award, although again not nearly as large as Mr. Stewardson requested.

As for the incident, the jury heard plenty of evidence to support damages. The jury heard Mr. Titus describe how he "redirected" Mr. Stewardson when in truth he caused his head to hit the wall twice [Tr. 105-06]. They heard Mr. Titus's testimony that he performed a leg sweep because of Mr. Stewardson's attitude and expression [Tr. 115-16] and watched Mr. Titus slam open the cell door into a naked Mr. Stewardson and then execute the leg sweep [Ex. 12:19:13-18]. All of this could validate and lend more support to the pain and suffering that needed to be compensated.

The defendants presented the argument that Mr. Stewardson's life improved after January 1, 2018, and they now claim that the evidence does not support a finding that Mr. Stewardson's mental health worsened after the incident. The jury heard all the same evidence they now point to—that Mr. Stewardson was married and expecting a child and seemingly doing well—and still decided that damages were warranted [226 at 6; Tr. 341]. The court also instructed the jury that Mr. Steward could recover "for the extent that defendant aggravated Mr. Stewardson's preexisting condition" but not "for the preexisting condition itself" [213 at 5, Instr. No. 10]. Courts presume that juries follow judicial instructions, and the defendants offer nothing to rebut that presumption here other than the complaint that the damages are high. *See Chlopek v. Fed. Ins. Co.*, 499 F.3d 692, 702 (7th Cir. 2007). Based on this record, the court cannot say that because six years later a plaintiff is doing well, there was not sufficient damage to sustain the award or that the jury disregarded the court's instructions.

The defendants next provide the court with a chart of cases they believe are comparable. Other cases "provide a reference point that assists the court in assessing reasonableness; they do not establish a range beyond which awards are necessarily excessive." *Farfaras v. Citizens Bank & Trust*, 433 F.3d 558, 566 (7th Cir. 2006). They point to cases where "plaintiffs sustained negligible injuries" and received much smaller awards *See Driggers v. Sanders*, No. 1:06-cv-1112 (C.D. Ill. March 5, 2009); *Kaufman v. City of Chi.*, No. 1:17-cv-7491 (N.D. Ill. May 21, 2021); *Williams v. Racine Cnty.*, No. 06C0819 (E.D. Wis. March 3, 2011). These awards range from $150 to $53,700. But these cases are on the low end, even for their chart, which also includes awards as high as $1.56 million for a hospitalized plaintiff. *See Harris v. City of Milwaukee*, No. 2:14-cv-1002 (E.D. Wis. March 4, 2020). The defendants focus on physical injury, specifically surgery and hospitalization, but the jury in this case was also considering mental injury—and not unreasonably so given the events.[1] Mr. Stewardson presents cases with compensation as high as $1.85

---

[1] The jury was instructed to "consider the following types of compensatory damages, and no others: the physical, mental, and emotional pain and suffering, loss of a normal life, and loss of an ability to function as a whole person that Mr. Stewardson has experienced and is reasonably certain to experience in the future." [213 at 5, Instr. No. 9].

million. *See Klein v. Cnty. of Lake*, No. 2:28-cv-349 (N.D. Ind. Sept. 20, 2019). Mr. Stewardson also offers a $2.5 million compensatory award without hospitalization or severe physical injuries. *See Ibanez v. Velasco*, 2002 U.S. Dist. LEXIS 7364 (N.D. Ill. Apr. 25, 2002).

Considering not just the acceptable range of these cases but their nature, and then the unique nature of this case, $400,000 was not an unreasonable or irrational award. The jury's award was both sufficiently connected to the evidence presented and within the range of damages in comparable cases. Accordingly, the court denies the motion to remit.

B.  *Punitive Damages.*

Mr. Titus next asks the court to reduce the punitive damages award against him to $50,000 or grant a new trial on the issue of punitive damages. Mr. Titus asserts that the award of $850,000 violates the Fourteenth Amendment's due process clause. *See BMW of North America, Inc. v. Gore*, 517 U.S. 559, 568 (1996); U.S. Const. Am. XIV. Due process forecloses punitive damage awards from being "grossly excessive." *BMW,* 517 U.S. at 562; *Beard v. Wexford Health Sources, Inc.*, 900 F.3d 951, 953 (7th Cir. 2018). Courts must look at three guideposts when determining the constitutionality of a punitive damages award: "the reprehensibility of the defendant's conduct, the ratio between punitive and compensatory damages, and any civil penalties that punish similar behavior." *Beard*, 900 F.3d at 954; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).

Punitive damages must have a "reasonable relationship" to compensatory damages. *BMW*, 517 U.S. at 580. Although due process eludes an exact formula, *see id.* at 582-83, "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process," *State Farm*, 538 U.S. at 425; *accord EEOC*, 707 F.3d at 839. Courts "police a range, not a point." *Est. of Moreland v. Dieter*, 395 F.3d 747, 757 (7th Cir. 2005) (citation omitted). Depending on the compensatory damages amount and the harm, an even greater ratio may be permissible. *State Farm*, 538 U.S. at 425. The analysis turns on the particular facts and circumstances. *Id.*; *see Mathias v. Accor Econ.*

7

*Lodging, Inc.,* 347 F.3d 672, 676-78 (7th Cir. 2003) (upholding a punitive damages award ratio of 37:1 based on the case's specific facts). "So long as the award has a reasonable basis in the evidence, a jury has wide discretion in determining damages." *Gracia*, 842 F.3d at 1025. Courts largely defer to the jury's discretion, only reducing awards that are "monstrously excessive," "not rationally connected to the evidence," or the result of juror "passion or prejudice." *American Nat'l Bank & Trust Co. v. Reg'l Transp. Auth.*, 125 F.3d 420, 437 (7th Cir. 1997) (citation omitted).

Mr. Titus first claims that the $850,000 award stemmed from the jury's passion or prejudice. He points to Mr. Stewardson's closing argument and evidence about his troubled past to argue that the award lacks a rational connection to the evidence.

Mr. Titus waived objections to Mr. Stewardson's closing arguments when counsel declined to object at trial. "Counsel for the defense cannot as a rule remain silent, interpose no objections, and after a verdict has been returned seize for the first time on the point that comments to the jury were improper and prejudicial." *Carmel v. Clapp & Eisenberg, P.C.,* 960 F.2d 698, 704 (7th Cir. 1992) (quoting *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 238-39 (1940)); *see also Smith v. Rosebud Farm, Inc.,* 898 F.3d 747, 753 (7th Cir. 2018) (holding that a party waived any argument over improper closing statements when counsel failed to object). A curative jury instruction would have been the proper remedy if an error occurred, and rather than ask for one Mr. Titus chose to gamble on the jury, a risk the law usually holds is "binding on the gambler," with few exceptions. *Holmes v. Elgin, J. & E. Ry.*, 18 F.3d 1393, 1398 (7th Cir. 1994) (citation omitted). Only plain error might save a party—when the statements, viewed in light of the whole record, prevented a fair trial. *United States v. Briseno*, 843 F.3d 264, 269 (7th Cir. 2016) (no new trial "unless there was an error so egregious that the district judge should have stepped in even though no objection was made") (quotations omitted).

Mr. Titus raises several objections to the closing. He claims that Mr. Stewardson's counsel made "obvious references to instances of police misconduct reported in the national media" because he said

8

the case was about "officers everywhere" [225 at 16; Tr. 540:7]. But Mr. Stewardson's counsel used "officers everywhere" in the context of explaining that "the overwhelming majority of officers are good…great." [Tr. 540:7-9]. He was contrasting Mr. Titus with the good officers, not hinting subversively at police misconduct. He argued that letting Mr. Titus' actions go without consequence may be one drop, but without deterrence or consequence, one action could create ripples by making other officers think the action was permissible, leading to a "white squall" rather than one drop [Tr. 541:21-22]. Punitive damages are there in part to act as deterrence and make statements about what a community finds reprehensible—explaining that this didn't create prejudice.

Mr. Titus also objects to comments about the culture of the jail [226 at 17]. These comments were made in reference to the failure to intervene count against Officer Biggs, not Mr. Titus' excessive force and battery, and thus not indicative of prejudice when the jury exonerated Officer Biggs [Tr. 546-547; 561:10-14]. Finally, Mr. Titus objects to the alleged assertion that they (a reference to the Sheriff of Cass County) ignored arrestees, denied them telephone calls, left them in the freezing cold, denied them medical care, and denied them food. But that's not what Mr. Stewardson's counsel said. He took the jury through a timeline of things Mr. Stewardson asked for; those aren't unfair allegations but requests Mr. Stewardson made that were denied or ignored [Tr. 560-61]. Mr. Titus tries to characterize arguments as accusations of broad cultural misconduct, but all Mr. Stewardson's counsel did was tell the jury what happened to Mr. Stewardson, in this one instance. Once the missing context is provided, the statements aren't troubling, and certainly none were so egregious as to warrant the court's unsolicited interjection at trial. *See Briseno*, 843 F.3d at 269.

Mr. Titus argues that he did not object because courts disfavor objections during closing arguments and that no curative instruction could have erased the statements from the jury's memory. Neither argument warrants a new trial. Indeed, the arguments merely underscore that the decision was a strategic one, not one of error. What is more, if the statements made at closing were so prejudicial as to

9

prohibit a fair trial, then Mr. Titus should have objected even if he believed the court disfavored objections during closing; the court assures Mr. Titus judicial economy disfavors redoing trials more. He also had the option to ask for a curative instruction. Courts have a "strong presumption" that the jury follows instructions, and curative instructions are designed to mitigate harm. *Chlopek*, 499 F.3d at 702; *see also Willis v. Lepine*, 687 F.3d 826, 834 (7th Cir. 2012). Mr. Titus does not provide the court with any reason to override that presumption and find that a curative instruction would have failed here.

Second, Mr. Titus argues that sympathy for the plaintiff's childhood clouded the jury's judgment. He claims that an award this size must have been born of passion or prejudice and cannot possibly be rationally related to the evidence. The jury saw plenty of evidence beyond just Mr. Stewardson's childhood to reach this amount, including video footage of the incident and testimony about the damage to Mr. Stewardson's mental health. Curiously the video was not shown to the jury during closing argument, and still the images of excessive force that the jury once saw could leave an indelible impression. And Mr. Titus invited some of the information that now concerns him [Tr. 299-306].[2] He cannot open the door during trial then try to close it afterwards. Rule 59 isn't a tool to correct strategic litigation decisions with the benefit of hindsight or rethought. *See Resnick*, 594 F.3d at 568.

Mr. Titus next argues that the BMW guideposts factors (reprehensibility, ratio, and comparable civil penalties) mandate the vacatur of the jury's $850,000 verdict. *See Beard*, 900 F.3d at 954; *State Farm*, 538 U.S. at 418. With respect to reprehensibility, "perhaps the most important indicum of the reasonableness of a punitive damages award," *Kunz v. DeFelice*, 538 F.3d 667, 679 (7th Cir. 2008), even

---

[2] The defense now objects to testimony that evoked sympathy for Mr. Stewardson's "sad childhood and troubled life," claiming that unfairly prejudiced the jury [226 at 9], but the defense invited statements like "[m]y whole life has been a dark place" from Mr. Stewardson on cross [Tr. 303]. Mr. Titus questioned Mr. Stewardson on his mental health, asking "you had, in fact, attempted to commit suicide at least twice before, correct?" [Tr. 299:9-11] and "you were seen at Four County in the early 2000s, 2002 through 2004" [Tr. 300:14-16]. The questioning was so thorough that Mr. Stewardson even asked opposing counsel, "Do I have to relive some of the darkest moments of my life over and over again?" [Tr. 305:23-25]. If the defense was concerned about the potential prejudicial effects, one might have expected them not to focus on presenting more of this information to the jury.

10

Mr. Titus concedes that his actions were violent, which the law deems most reprehensible. *BMW*, 517 U.S. at 575-76. An officer's brutality, done while in a position of public trust, also contributes to the reprehensibility for punitive damage purposes. *Kunz*, 538 F.3d at 679. The video evidence here showed repeated uses of force—wall slams, holding Mr. Stewardson to the floor for 26 minutes, and the unnecessary leg sweep. An intoxicated individual presents unique challenges, but this wasn't an open street or field but confined quarters with an overwhelming presence of officers. Piling onto the violence here was a certain level of callousness; Mr. Stewardson credibly testified he could hear laughter from inside his cell [Tr. 272] [Ex. 101 at 12:57 (officers rewatching leg sweep and laughing)]. Mr. Titus appeared to laugh while testifying about it at trial [Tr. 129:15-20]. He was not a sympathetic witness. A jury could understandably find these events reprehensible, given its violent nature and Mr. Titus's seemingly flippant approach to it. The most important factor in the analysis weighs heavily against Mr. Titus. *See Kunz*, 538 F.3d at 679.

Mr. Titus next argues that the ratio between compensatory damages ($400,000) and punitive damages ($850,000) is flawed. Single digit ratios are typically reasonable. *State Farm*, 538 U.S. at 425; *EEOC*, 707 F.3d at 839. This ratio is 2.1:1—well beneath "judicial eyebrow" raising territory. *See BMW*, 517 U.S. at 583. Mr. Titus attempts to dispute the ratio's premise, arguing that the compensatory damages were so unreasonable and irrational that that award cannot possibly be a fair baseline for the ratio. But not so on this record.

Finally, Mr. Titus reaches the comparable penalties prong, which he argues is most important in this case. He asserts that others who used significantly more force were assessed far less in punitive damages. He points the court to judgments from other cases, but *BMW* focuses on statutory consequences and judgments. *BMW*, 517 U.S. at 584. Mr. Titus explains that battery is a Level 6 felony. *See* Ind. Code § 35-42-2-1(e). Under Indiana law, his actions could have resulted in incarceration between 6-30 months and up to a $10,000 fine. Ind. Code 35-50-2-7(b). The parties focus on the fine, but the

11

conduct is also reprehensible enough that the Indiana legislature attaches prison time. Additionally, the state battery charge does not encompass the power imbalance inherent in the officer-arrestee relationship, something that adds to the considerable reprehensibility here. *See Kunz*, 538 F.3d at 679; *see also Farfaras*, 433 F.3d at 567 (emphasizing the increased reprehensibility surrounding using power imbalance as an opportunity to harm someone).

Courts can also consider civil penalties imposed in other cases, *Kapelanski v. Johnson*, 390 F.3d 525, 534 (7th Cir. 2004), and both parties suggest that is the more appropriate path here. Civil judgments in similar cases cover a broad amount range. And in these cases, the court's work is maintaining an acceptable range. *See Est. of Moreland*, 395 F.3d at 757. Even weighing this factor as part of the mix, the court cannot say the punitive damage award is irrational or unconstitutional.

Mr. Titus nonetheless argues that a punitive award this high will punish him for the rest of his life. One should think of that before engaging in this type of conduct. Personal finances may factor into punitive damage calculations when the defendant cannot possibly pay. *Kemezy v. Peters*, 79 F.3d 33, 36 (7th Cir. 1996). "The defendant who cannot pay a large award of punitive damages *can point this out to the jury* so that they will not waste their time and that of the bankruptcy courts by awarding an amount that exceeds his ability to pay." *Id.* (emphasis added). But, as Mr. Stewardson says, Mr. Titus chose not to argue this to the jury [Tr. 505-513 (direct examination of Mr. Titus)]. *See Stewardson v. Cass Cnty.*, 2023 U.S. Dist. LEXIS 48423, 19 (N.D. Ind. Mar. 22, 2023). Once more this was a strategic decision that Rule 59 was not designed to undo. That wisdom doesn't change with an expensive verdict. The court denies the request to vacate the punitive damage award.

    C. *New Trial.*

The defendants argue that they are entitled to a new trial even if the court declines to remit or vacate the damage awards based on cumulative issues that caused the trial to be fundamentally unfair.

None of their arguments warrants a new trial, an "extraordinary remed[y] reserved for the exceptional case." *Childress*, 787 F.3d at 442.

### 1. *Order in Limine.*

The defendants first argue they are entitled to a new trial because the court excluded evidence that Mr. Stewardson was intoxicated and acting belligerently at the scene of his arrest. The court has already addressed this evidence's admission twice [195 at 14; Tr. 211-12]. The defendants provide no reason to reverse these decisions now. *See* Fed. R. Evid. 403, 404, 602.

The evidence the defendants sought to present was not particularly probative to the case's legal and factual questions, especially in light of its propensity and prejudicial nature. *See* Fed. R. Evid. 403, 404. Excessive force is assessed under an objective reasonableness standard. *Graham v. Connor*, 490 U.S. 386, 395-96 (1989). The jury must analyze whether the officer's actions were objectively reasonable in light of the facts and under the circumstances confronting the officer at the time of the incident. *Id.* at 396-97. The "circumstances" mean "only those circumstances known and information available to the officer at the time of his action." *Sherrod v. Berry*, 856 F.2d 802, 804 (7th Cir. 1988). "Knowledge and facts gained after the fact . . . have no proper place in a court's or jury's analysis of the reasonableness of the actor's judgment." *Common v. City of Chi.*, 661 F.3d 940, 943 (7th Cir. 2011). In evaluating the officer's actions, "the fact finder must do so with blinders on—viewing the circumstances and facts only as they were known to the officer at the time." *Id.* "[E]vidence outside the time frame of the [incident] is irrelevant and prejudicial." *Palmquist v. Selvik*, 111 F.3d 1332, 1339 (7th Cir. 1997).

The defense continues to argue the *Common* exceptions. The law permits a "peek under the blinders in certain circumstances," namely that (1) the credibility of a witness "can always be attacked by showing that his capacity to observe, remember or narrate is impaired" and (2) a "witness could always be impeached by demonstrating contradictions in his testimony." *Common*, 661 F.3d at 943-44.

No one disputed that Mr. Stewardson was intoxicated during the events on January 1, 2018. He admitted it at trial [Tr. 237:14-15]. The officers knew he was intoxicated at the jail. That not just lessens the probative value of evidence of his intoxication at the scene of arrest but enhances the undue delay and cumulativeness that such evidence would have caused at trial. *See* Fed. R. Evid. 403. It also illustrates that Mr. Stewardson's state of intoxication wasn't a factual issue seriously in dispute to justify reaching back to the arrest scene.

In addition, at the final pretrial conference, the court saw little proffer that the defendants knew about Mr. Stewardson's conduct during his arrest [195 at 14]. At trial, the defense offered the testimony of Officer Schlosser, one of the arresting officers, but still never proved that officers at the jail knew about the arrest scene conduct [Tr. 208]. Additionally, the court permitted the defense to introduce testimony about what happened once Mr. Stewardson was brought to the facility, what happened when he exited the squad car, and what may have happened in the moments before he exited the squad car [Tr. 211-212]. The defense asserts that the court excluded Mr. Stewardson's behavior "immediately before his arrival at the Cass County Jail," but as the transcript shows the court allowed some evidence of his behavior—the reason for his arrest, his blood alcohol content, his comments before exiting the car—which makes one wonder about the defense's definition of "immediate" [Tr. 211]. No one disputed that Mr. Stewardson was intoxicated, and everyone, including Mr. Stewardson, agreed that he was still intoxicated at the jail, making the other evidence superfluous [Tr. 211; 237].

The defense alleges that the exclusion of this evidence made the trial "fundamentally unfair" because it would have made the fact that Mr. Stewardson stumbled and resisted at the jail more probable. In addition to the evidence *supra*, the jury heard testimony from Mr. Titus about Mr. Stewardson's condition [Tr. 508]. Perhaps most important, the jury watched the incident unfold on tape. The probative value of additional evidence would have been exceedingly low. *See* Fed. R. Evid. 403. Excluding evidence of conduct the officers at the jail did not even know about, particularly when Mr. Stewardson admitted

14

his intoxicated state, did not make the trial fundamentally unfair. Its probative value, marginally if any, was substantially outweighed by its prejudice, cumulativeness, and risk of confusion.

2. *Closing Statements.*

The defendants waived their objections to Mr. Stewardson's closing argument. Additionally, even if Mr. Titus had not waived this argument, new trials after improper closing statements are "warranted only if [the] allegedly improper closing remarks depart from the evidence presented at trial and result in substantial prejudice to the opposing party." *Willis v. Lepine*, 687 F.3d 826, 834 (7th Cir. 2012) (quoting *Jones v. Lincoln Elec. Co.*, 188 F.3d 709, 731 (7th Cir. 1999)). "[I]mproper comments during closing argument rarely rise to the level of reversible error." *Willis*, 687 F.3d at 834; *see also Smith v. Rosebud Farm, Inc.*, 898 F.3d 747, 753 (7th Cir. 2018) (same).

The defendants now object to opposing counsel's statements, like telling the jury it was the "conscience of the community" and referencing police misconduct generally. But the defendants are decontextualizing and mischaracterizing the arguments. Mr. Stewardson mentioned "officers everywhere" when discussing how good most officers are, not police misconduct, as Mr. Titus alleges [226 at 17; Tr. 540]. Mr. Titus complains about Mr. Stewardson asking the jury to consider the consequences of his actions for the community and argues that comments about the culture in the jail were wrong; but one of the very purposes of punitive damages is deterrence, so these considerations were in line with this request. *See BCS Servs. v. BG Invs., Inc.*, 728 F.3d 633, 641 (7th Cir. 2013). The court finds no error worthy of a retrial.

3. *Proposed Jury Instruction No. 8.*

The defense also spends two paragraphs in its Rule 59 motion arguing that the exclusion of its proposed instruction (No. 8) misapplied Indiana law. The proposed instruction read: "Indiana law places the burden on plaintiffs to overcome a presumption that police officers who use force do so reasonably and in good faith" [171-1 at 9, Instr. No. 8].

"A district court has considerable discretion in phrasing, organizing, and adapting jury instructions to the specific needs of the case, as long as the instructions fairly and accurately summarize the law and have support in the record." *United States v. Benabe*, 654 F.3d 753, 775 (7th Cir. 2011). A jury instruction error warrants a new trial "only if the instructions as a whole misled the jury as to the applicable law." *United States v. Rainone*, 816 F.3d 490, 494 (7th Cir. 2016) (quotation and citation omitted). A misstatement of the law must also "prejudice the objecting litigant." *Huff v. Sheahan*, 493 F.3d 893, 899 (7th Cir. 2007). Here, the argument seems to be that the given instructions failed to paint a whole picture, but courts consider the jury instructions given as a whole.

The trial instructions properly guided the jury. The court provided the jury with the following instruction on the battery claim:

> "To succeed on a battery claim against the Sheriff of Cass County, Mr. Stewardson must prove each of the following two things by a preponderance of the evidence: 1. Officer Titus, in his official capacity, intentionally used force against Mr. Stewardson. 2. The force Officer Titus used was unreasonable. If you find that Mr. Stewardson has proven each of these things by a preponderance of the evidence, then you must decide for Mr. Stewardson, and go on to consider the question of damages against the Sheriff of Cass County. If, on the other hand, you find that Mr. Stewardson has failed to prove any one of these things by a preponderance of the evidence, then you must decide for the Sheriff of Cass County, and you will not consider the question of damages against the Sheriff of Cass County." [213 at 2-3, Instr. No. 4].

The court also instructed the jury that "law enforcement officers can use force that is reasonably necessary under the circumstances" [213 at 4, Instr. No. 6] and that Mr. Stewardson bore the burden of proving that the force was unreasonable [213 at 2, Instr. No. 3]. Nothing in today's motion explains why the jury was misled or failed to perceive the full picture of the law, nor does it explain how the defendants were prejudiced. The jury instructions, taken as a whole, *see Rainone*, 816 F.3d at 494, provided the jury with the information that officers could use reasonable force and that the burden rested on Mr. Stewardson to prove that the force was instead excessive or unreasonable [213 at 2-3, Instr. Nos. 3, 4, 5]. The court explained the factors that the jury could use to analyze the reasonableness [213 at 4, Instr. No. 6]. When analyzed as a whole, the jury instructions address the proposed instruction.

16

Additionally, the jury had to find that Mr. Titus acted with malice or in reckless disregard to award punitive damages—and did. This means that the jury found that Mr. Stewardson proved that the force was both unreasonable and done intentionally, with malice or "in reckless disregard of Mr. Stewardson's rights" [213 at 6, Instr. No. 13]. Such a finding means that Mr. Stewardson proved that Mr. Titus did not act reasonably or in good faith. Excluding the proposed instruction did not prejudice the defendants or mislead the jury.

Finally, the defendants argue that if any individual issue doesn't warrant a new trial, then the combination created a fundamentally unfair trial. The defense argues the cumulative issues "present an exceptional circumstance that constitutes plain error" and warrant a new trial. Three weak objections don't create a strong one. A new trial is not warranted.

## CONCLUSION

Accordingly, the court DENIES the Sheriff of Cass County and Mr. Titus's motion for remittitur of compensatory damages, vacatur of punitive damages against Mr. Titus, and a new trial [225].

SO ORDERED.

November 1, 2023                                    *s/ Damon R. Leichty*
                                                    Judge, United States District Court